Case No. 315-0709, The Rock Island Boatworks, Inc. Appellant Cross-Appellee by Lee Marshall v. Rib Holding Company Appellee Cross-Appellant John Elias Mr. Marshall, you may proceed. Thank you. Good afternoon. May it please the Court and Counsel, The trial court in this case erred in three respects, any one of which would support reversal. First, by interpreting the contract language, obtain any certificate to unambiguously require a challenge through litigation to a tax determination. Second, by holding as a matter of law that purchasers' efforts to obtain the favorable tax determination were not commercially reasonable when commercial reasonableness is a question of fact and the purchaser repeatedly approached the Board and its staff about the issue. And third, by interpreting the tax statute at issue to unambiguously require that the tax reset upon transfer of a license. Now, with respect to the contract interpretation issue, the seller here has taken a boilerplate provision, tax cooperation provision, and turned it into a requirement that the purchaser challenge and then litigate an adverse tax determination. In the seller's reading, the word obtain essentially means to challenge or to litigate, and the word certificate essentially means a trial court or appellate court decision overruling an adverse tax decision. I would suggest that those words cannot bear that weight. The word obtain does not encompass litigation. It means to procure or attain. It's not challenge. It's not litigate or appeal. If the parties had intended those types of affirmative obligations, which are expensive and significant, they would have said so. The word certificate does not mean a judicial decision. A certificate, and I'm quoting now here from the definition, is a written act or official representation that some act has or has not been done, or some event occurred, or some legal formality has been complied with. It does not mean going out and getting a judicial decision overruling a tax administrative decision. Now, the purpose of contract interpretation, of course, is to ascertain the intent of the parties. It is simply not the case that both parties to this transaction intended that Section 11.2C of the Asset Purchase Agreement to require the purchaser to litigate a tax issue against its regulatory authority, and that is clear from both the intrinsic and the extrinsic evidence. With respect to the intrinsic evidence, I've already described the argument under 11.2C, which is the provision that they rely on. But there's another provision I would like to focus the Court's attention on, and that's Section 2.3G of the Asset Purchase Agreement. This is the provision that essentially says if there is a tax determination saying that the tax should reset, then the parties are going to split the proceeds of that. And that section does not say, this is a section that specifically addresses the issue. That section does not say that if there's a litigation about it or there's an obligation to litigate, and it doesn't say what would happen if there was a decision from a trial or appellate court requiring the tax to reset. It doesn't say what you do with the money there. So the provision that most specifically addresses the issue doesn't say anything about what the plaintiffs have interpreted 11.2C to mean. Now, the extrinsic evidence, the plural evidence, is even clearer. It is beyond doubt here that both parties did not intend for there to be an obligation to litigate. That is because the purchaser consistently said that they were not going to do it, both before execution of the Asset Purchase Agreement and after, but before closing. Even the seller acknowledged that. So for example, prior to execution, the seller acknowledged, it is clear to seller the purchaser is not going to contest this with the gaming board. That's before the contract is signed. Prior to closing, the purchaser said at no time during or subsequent to the negotiation of the APA did purchaser assume a duty or responsibility to challenge the determination of the IGB of the wagering tax rate. There is nothing in the APA to even suggest a commitment on our part. Now, how did the seller respond to that? Did the seller say, well, yes, there is. It's an 11.2C, this provision about obtaining a certificate. No, the seller didn't say that. The seller remained silent. The seller didn't even mention 11.2C until over two years after the APA was executed and over 18 months after the transaction closed. In the meantime, the seller itself pursued litigation against the gaming board, which was ultimately dismissed. One would think if the seller had intended 11.2C to require the purchaser to litigate the issue, the seller would not have itself gone out and tried to litigate the issue itself. Now, the seller's response on appeal is pointing to the parole evidence and saying the 11.2C was specifically amended to address this issue. First of all, it's ironic to say the least that the seller is resorting to parole evidence to support its interpretation of what it says is an unambiguous provision. But more to the point, if the seller had specifically amended 11.2C to address this issue, seller never told purchaser that. Now, seller's counsel is very smart and capable, but it would be a very sharp practice indeed to make these types of subtle amendments, remain silent while the purchaser is saying we have no obligation to do this, and then two years later say, aha, look at 11.2C, yes, we do. The bottom line here is this. It would turn the concept of mutual assent on its head to hold that both parties here intended Section 11.2C to require litigation when the provision does not clearly say that, and one party is consistently saying that they are not going to litigate it before the APA is executed and before the transaction closes. Now, the second issue I would like to address is the one of commercial reasonableness. Reasonableness is a quintessential question of fact. Here, the trial court decided as a matter of law that the purchaser breached the provision requiring commercially reasonable efforts and decided the issue on summary judgment. So what is the evidence that the purchaser acted commercially reasonable that creates a question of fact on this issue? First, there were repeated communications with the board and its staff to get the board's position on the issue, including with the board's general counsel, the board's auditor, and the board's administrator, which is the chief staff person that reports to the board, who reports to the board. After going to the board's staff three times and being told, no, the tax is not going to reset, and this will be our recommendation to the board, and the board will ask us for our opinion, and the board will probably follow our recommendation. In our view, in purchaser's view, it would have been futile at that point, having tried three times to convince the board's staff of this interpretation to continue to pursue this issue. Why would it make sense to continue to spend money on an administrative challenge, on litigation, to force the board to jump through additional hoops, especially when you're trying to establish a good relationship with your chief regulatory authority? Now, finally, in my view, the best evidence of commercial reasonableness here is that the purchaser had its own $1.9 million at stake. The parties were to split the proceeds of any tax refund coming from a determination that the tax would reset. So the purchaser was obviously exercising its business judgment, if you will, that it made sense at this point to walk away from this issue. They had already tried three times. They had already spent money pursuing this, and after being told three times by the board's staff how the board would rule, it was commercially reasonable not to continue to pursue this. Now, the trial court held that it was per se commercially reasonable to legally minimize one's tax liability. And that makes sense up to a point. But it also isn't the question. The question here is whether the purchaser breached an obligation to act commercially reasonable by doing what it did. And the real issue is how far do you go? Is it commercially reasonable to go to the board's staff and be told three times, no, it's not going to reset? Do you have to go to the full board for that to be commercially reasonable? If the board then issues a formal opinion telling you no, do you then have to challenge it in the trial court under the Administrative Procedures Act? Do you then have to appeal it to this court? Do you then have to appeal it to the Illinois Supreme Court? Do you have to lobby for a legislative change? How much is necessary in order to satisfy this commercially reasonable standard? And what I would submit to this court is that that is a question of fact. Well, I'm not saying here, but some questions of fact can be involved in summary judgment. Evidence supports it. The fact that something is a question of fact doesn't mean that it can't be resolved on summary judgment. If so, fact it over. That is, of course, true. There is no dispute of material fact relevant to the issue. And what I'm suggesting to the court is because the purchaser had its own $1.9 million at stake, because the purchaser went to the board staff three times and got the same answer, because the purchaser was in a regulatory relationship with the board that was going to govern all of their conduct going forward, that here there is enough evidence that this was commercially reasonable in order to create that question of fact that made it a triable issue. With respect to the statute, which is the third basis for reversal, the parties effectively recognized that there were two possible interpretations of the statute when they included this provision 2.3G, which said, if you get a determination from the board, then we're going to split the proceeds. They recognized that there were two possible interpretations. Thank you. And that's consistent with the language of the statute. The statute doesn't specify what happens when the owner of the license changes. Nothing in the statute says it resets, as the seller has argued. The statute, in fact, says it is based on the calendar year annual receipts. And when you look at the graduated tax receipt rates in the statute, it says adjusted annual – let me make sure I get the language correct – adjusted gross receipts. It doesn't say adjusted gross receipts of the license owner. It only goes on a license owner. Gaining taxes, section 20.3G of the Asset Purchase Agreement goes into the gaining tax. And the statute says that the tax rate applies to the license holder that effects the period. So I don't know if it applies to the person that holds the license for those days. I don't know, to me, how that is – what ambiguity there is. If I hold the license, I pay the tax. If I don't have the license from September to December 31st, I don't have a tax for that at those times. And that's precisely the argument that was presented to the board staff. And what the board staff came back and said is, yes, the tax is imposed on the license owner. But if you look at the graduated rates, it says adjusted gross receipts. And there's a reference in the statute to the gambling operation. So in their view, you looked at the annual adjusted gross receipts of that casino with route respect to a change of ownership during that time period. And what I am suggesting to the court is that the board's – the position of the board staff was reasonable. There is an ambiguity here. And as a result, some deference to the view of the board staff was required. And the legislative intent, therefore, comes into play. And, of course, the legislative intent with this statute is expressed. It's written into the statute to maximize the amount of revenue, gambling revenue, to assist and support education in the state of Illinois. While I would concede that many statutes, many taxing statutes, have an intent to maximize revenue, this one expressly says it in the statute. And the board was certainly very interested in doing that when it interpreted the statute. So thank you very much. And I will reserve the rest of my time for rebuttal if there aren't any other questions. Thank you. Mr. Elias? Elias. Elias, excuse me. May I please use the court counsel? Thank you, Your Honor. Virtually all of the arguments raised by seller's counsel – excuse me, purchaser's counsel, I'll use purchaser and seller because that's what we've been using throughout the case, if you don't mind. And all of the arguments we've heard before, they were addressed comprehensively in the trial court's decision. And I'll address a few of them here, but they've all been brought up ad nauseam. Now, this is a really – it arose out of an asset sale of the casino. It's a case of first impression as to how taxation would occur in the year of the sale in an asset sale. There's a graduating tax rate. All the previous transactions had been stock sales or mergers, so this issue had never arisen. So it was clearly a case of first impression. The judge ruled also, and I agree with him, this is not binding on the gaming board or the state. They're not a party. They're just proceeding and chose not to do it. So we're dealing with an asset sale, which has in it an asset purchase agreement, which has in it a comprehensive, sophisticated tax cooperation clause, which is typical for most sophisticated transactions of this size. And it basically – I'd like to read it to you just to make sure we're talking about the same thing. Purchaser and seller will, upon request from the other, use their reasonable commercial efforts to obtain any certificate or other document from any governmental agency or any other person that may be necessary to mitigate, reduce, or eliminate any tax defined that could be imposed, including without limitation with respect to the transactions contemplated hereby. Now, this is a very typical clause. It arose out of a form book that was submitted to the trial court and not objected to, since the other side also submitted some forms. And three revisions were made to the form that are very important here. The first was commercial reasonable efforts was substituted for best efforts. We agreed that we would only do reasonable. The second thing was the definition of tax was specifically expanded to include gaming taxes. Third, governmental authority was changed to government agency capitalized to include the courts. Now, I would submit to anybody who looks at this section, when you read it as a whole. Repeat that, please. The last piece, ma'am? Governmental agency includes the courts. What was it before it said government agency? The form just said governmental authority, which is not defined in a form book and probably doesn't mean the court. By changing authority to agency, that includes the court? No, Your Honor. I'm saying that in the process of negotiation, it was stipulated here, whether it came from a form book or not, that court was included in this transaction as one of the state agencies that could be appealed to. Whether it came from a form book or out of our minds or we got lucky or whatever, it was listed in there as one of the places. So when you have a statute that's talking about gaming taxes, commercially reasonable efforts, and governmental agency includes the court, it's somewhat naive for a buyer, a purchaser with sophisticated counsel, to come along and say, oh, they didn't know that could be. We could go to the board and ask them to really determine whether they've calculated the taxes correctly. It doesn't necessarily mean that we would have had a litigate to the courts because the board may have done the correct thing and agreed with us. I look at the underlying tax statute, which we'll get to in a moment, and I find it very, very simple and straightforward. In fact, as we went through negotiating this transaction, the whole reason it got so much play in the document and the negotiations is that we all thought that the graduated rates reset when we had a new licensed owner, simply because of the wording of the statute that was discussed during the purchaser's presentation. So while I suppose you could look at words like certificate in abstract and suggest that that word certificate doesn't mean this or that, when you look at the statute as a whole and you look at words like minimize, reduce, or eliminate taxes, I don't know of any certificates that minimize, reduce, or eliminate taxes. That is an active event of going to a public body that makes a determination and say to them respectfully, I think the taxes should have been computed this way. That's what minimization is, that is what reduction is, and that's what elimination is. It isn't going to the clerk of court and asking for a certificate or going to the gaming board staff and asking the administrator, hey, do you think this is the right way of looking at this? There was no analysis done. My client seller was not even put into the mix on that to discuss that with the gaming board. We were very respectful of the purchaser's position with the gaming board before the closing, and while most of the discussion we heard about discussions was pre-contract formation and therefore was barred under the integration clause in the document, the issue of whether the parties were going to challenge the gaming tax before the closing, nobody really wanted to do that. If you really look at the letters that purchaser's counsel was referring to, we were talking about what would happen after the closing. My clients wanted to sell, and it's a $2 million issue, but they certainly weren't going to turn their backs on a $182 million transaction before the closing and attempt to stop it, which they couldn't. What was the date of the closing? April 27th of 2011. And when did the seller formally request that the purchaser challenge the tax determination? In writing or orally or what happened? When was there a formal request after the closing? In the working capital process within three or four months. You've got to understand, in the transactional documents, this was posited as a working capital adjustment, which was going to be discussed between the parties and an arbitrator, an accountant. There's a formal requirement in the language of 11.2c that there will be a request from the other. When was that request made by the seller, and in what form? Your Honor, that one was made in 2012. There was another one made pursuant to the first request. Pardon me? The first request. What form was it? The first request was an objection to the working capital adjustment within three months after the closing in 2011. That process, interestingly, we were proceeding to have an accountant, arbitrator determine this issue, and what happened was purchasers counseled. So that request says pursuant to the provisions of 11.2c, we are requesting? No, it says pursuant to the provisions of Section 2 of the purchase agreement. We're asking the arbitrator to determine that tax is not owed, and you have to give us the money back whether you go to court or not. There was a process going on, and in fact, that process was stopped. Counsel referred to a prior piece of litigation. My client authorized suing the gaming board and the seller in an attempt to try to get this resolved without the purchaser looking like a litigant in order to be good guys. That got dismissed because the attorney general convinced everybody the seller didn't have standing. Which is the reason for the provision in the agreement. Pardon me? That's the whole reason behind 11.2. If there's ever a standing challenge, then you have to be able to ask the other parties. Yes, and that's what we did. As soon as we got thrown out, we asked them. And in terms of commercial reasonableness. Was that the second request you made after the litigation terminated? We tried once in the working capital adjustment. Yes. Then we went to court, and when that got aborted by the attorney general, we then went to the purchaser and said, please appeal this under 11.2c. Okay, and that was a verbal request or written request? Written request. And when did that happen? It was in the fall of 2012. Shortly after the prior case got dismissed. Very cooperatively at that point, by the way. They refused to do this for reasons that they didn't really want to irritate the gaming board. Which may have been a good business decision, but it's not cognizable under section 11.2c. And this argument about futility. Futility doesn't have to do with how many times you ask staff or the board. It has to do with the merits of the taxing session that would have been contested. And simply by virtue of the trial judge in this case agreeing with us, how could it be futile to appeal something or not pursue something because it's silly, because an administrator told us, the staff of the administrator told us five times, when once it was given to a judge, it was very clear to the judge, as it is to anybody who looks at this provision, that the gaming tax is reset because the tax is on the licensed owner. This is a tax on a person. And it's on the revenue received by that person, just like any other taxing statute. It's a person and the revenue received by that person. This was an asset deal. It is not a tax on the casino, no matter how many times it's said. It took us three years to get a reason from the purchaser why this tax, why we weren't right, and eventually they came up with, well, it's really a tax on the casino. It is not. It's a tax on a person to the extent of the revenues received by that person. I'm not here to talk about whether that's good public policy or whether it was intended, but that's what the section says. So all of this was briefed comprehensively and hopefully in a logical manner for the court, but our view of it is the statute is clear. The tax is on a person, not a thing, and if it's on a person, it follows that the gaming tax rates have to be reset, as the trial judge ruled, and we also believe that commercial reasonableness under Illinois law, that is to say whether or not they had an obligation to seek a refund once we made the request, I believe under Illinois law reasonable commercial efforts and contemplates fairness to both parties. That's the GM case in 207, which was cited in our brief. It's to both parties. The section 112C also refers to, quote, their reasonable commercial efforts, their commercial reasonable efforts in conjunction with the General Motors case before the Motor Vehicle Review Board where the Illinois court citing some California cases specifically said reasonable commercial efforts contemplates fairness to both parties. So whether or not it was a good decision for the purchaser for goodwill purposes, not to incite the ire of the tax collector or whatever, to say, we want to make an investment in the gaming board of $4 million because we think it's, even though we're entitled to the money, it would be a nice thing, it would get us some brownie points. It is not fair for it to be with the seller's money. And so that was what they chose to do, but we believe it was in flat contradiction of their contractual obligations with sophisticated counsel negotiating it for them. The words mean what they say and they mean something. And minimizing, reducing, or eliminating taxes does not mean going down to the recorder of deeds and getting a deed stamped, nor does it mean getting a certificate of good standing. It contemplates an active process of having something determined fairly. Now, I just want to reference our cross-appeal. We'll have some time later, hopefully. Our view on the cross-appeal was that the judge's damage assessment did not include what we're calling in this brief mandatory tax refund interest. When someone receives a tax-like refund from the state of Illinois, whether it's a sales tax, a gaming tax, an income tax, automatically interest is included in the refund. The taxpayer has just the same right to that as it has to the underlying tax. I went through the statutes in the brief. There's been no objection to the statutory analysis from purchaser, so I don't know what they think about it. I do know that the computer, whenever a taxpayer gets taxed back, the computer calculates the interest. That's what we did in the trial court for the trial judge. The trial judge ruled that we were not entitled to prejudgment interest, didn't say anything about mandatory tax refund interest. What he was thinking, I'm not sure. Whether it was a problem of communication on my part, I'm not sure either. But I do know that if we received $1,964,000 back in taxes, there would have been a computer calculation of those taxes. It's neither speculative nor really at issue. So I think the ‑‑ I think I need you to draw me a picture, and I'm sorry that I have to ask this question. Maybe it's a dumb question. When you were developing the agreement, the anticipated tax consequences to the seller was $1,571,000. The tax refund? I believe the seller's liabilities included that $1,571,000 to $1,258,000. I think it turned out to be $1,964,000. That's one of my questions. How does it become $1,009,000 when it looks like the liabilities column had it as $1,005,000? That's a good question. Oh, well, thank you. No, no, it's a very good question. Because depending upon what time of the year, it's a graduated tax. So depending upon how much the adjustment would be, depending on what time of the year, the schedule that you saw in the deal assumed a March 31st closing, and we didn't close later.  So everybody agrees that it was $1,009,000. Yes. If the tax were adjusted, what was the number going to be if it was reset? Is there a number? Yes, there is. All right. It's in the brief. The overall amount that the purchaser overpaid because the tax rates weren't reset was about $3,009,000. Under our agreement with the purchaser in the transactional document, we agreed to pay the same average tax the whole year. So there's an economic calculation that says since $3,009,000 was overpaid, we'll calculate it again as if we all paid the same rate, maybe it was 26%, as if one for all, all for one. And when those calculations were done, $1,009,064 was ours, and the rest was theirs. There's no dispute about that because when we filed the prior case, we agreed to the number, and actually the schedules in their joint exhibits, it's kind of ornate, but it's not. I think they're correct. So if the trial court's decision is reversed, what is the consequence to your client? They lose the $1,009,000? No. We had originally put it in escrow. Right. Yeah. We just don't get it. Okay. Yeah. And you want the amount of escrow plus pre-judgment interest and post? Yes. No, we want the amount of tax plus the interest that the State of Illinois would have paid on the tax had we received it. Just as an aside, we agreed earlier on to remove the escrow. There's no escrow. We have a letter of credit now instead. Okay. Sorry, no questions, but this is the benefit of argument. Thank you. Otherwise, I have to ask these guys. Thank you, Mr. Elias. Is there any issue about whether there was a timely demand? Well, yes, I think that there is. In terms of just to fill out the timeline for you, Your Honor, I think I can fill it out very clearly for you. The asset purchase agreement was executed in August of 2010. The transaction closed in April of 2011. In March of 2012, the seller brought a lawsuit against the gaming board. Was there a demand prior to that? There was an objection to the way the escrow was being split up, but it did not. It was a demand? No, it did not mention 11.2C. There was no discussion of 11.2C. In October of 2012, that lawsuit against the gaming board that was brought by the seller was dismissed. And then in November of 2012, the next month, is the first time that there is a demand and a reference to 11.2C as requiring these actions. Was that a timely demand? Could anything have been done at that point in time? I think – And you can tell me if it's a dumb question. I don't think it is a dumb question, Your Honor. I think that there was still the ability to challenge some of the refunds at that point. And perhaps all of them, I'm not sure. But I do know that there was a later point, I think perhaps after the first summary judgment, opinion was entered where the purchaser did go ahead and seek a refund with the board. But at that point, only about 3% of the amount was still in play because of limitations issues. And I think I'm getting that right. In our view, the fact that 11.2C isn't even mentioned until, you know, more than two years after the agreement is executed, more than 18 months after the transaction closes, after the purchaser has been saying time and time again, we're not going to do this, we're not going to do this, we don't have an obligation to do this, is very good evidence that there was no intention on the parties that this provision 11.2C required this. There was no mutual assent. This provision does not reflect the mutual intent of the parties that an obligation under 11.2C to challenge this tax decision and to potentially litigate it was intended. And, you know, what you heard during Mr. Elias' presentation was a lot of extrinsic evidence. You heard about the history of the negotiation. You heard about what amendments were made. None of which are, well, what amendments Mr. Elias made. And what I would submit to the court is that Mr. Elias is effectively admitting that the provision does not clearly cover this demand. Is your position that 11.2C is unambiguous but does not require a court order? Because I understand the argument you're making that you say it's unambiguous, but let's look at some other things that we normally use to interpret ambiguous language. And if I understand your argument correctly, you agree with the court's ruling, it's unambiguous, but you disagree with it. This is a common problem that you see happen in the trial court. It's sort of like when there are class motions for summary judgment and each side says that there's no disputed material fact and then you have the trial court issue an opinion and each side or maybe one side is like, whoa, hold on a second, there's a problem. From our perspective, and this is the way we presented it in the trial court and in this court, the provision unambiguously does not require the type of challenge that they demanded here. We did not breach this agreement. Commercially reasonable or not, we did not breach this agreement. Obtaining the certificate does not require a tax appeal. Now, if there's any ambiguity about that, then we say look at the extrinsic evidence, which the trial court did not do. The trial court said it was unambiguous under their interpretation, which we strongly disagree with. This relies on saying, well, look at all this extrinsic evidence. I'm saying that's effectively an admission that we've got an ambiguity here. And the trial court did not look at the extrinsic evidence. It didn't weigh it. It didn't hold a hearing about it. It didn't consider it in its opinion. And in my view, that requires a reversal here because there is a ton of extrinsic evidence. Now, he's going to rely on how the provision was amended. We're going to rely on all the correspondence back and forth between the parties, both prior to execution and prior to closing. So you're only requesting a reversal and a hearing on the ambiguity? No. You're telling me that this is unambiguous and you had no requirement to challenge it, that you did what you needed to do, they requested you to do something, you contacted the tax board. I have alternative positions. Look, I mean, I have to here. I mean, and I strongly believe that this provision unambiguously did not require what they demanded. Let me ask you this. What was your position in the trial court regarding ambiguity? It's the exact same position we're taking here, that it unambiguously does not require it, but if you're going to find an ambiguity, here's what the extrinsic evidence shows, and this is why it was not the mutual intent of the parties. So if it's found to be unambiguous, and I support your position that there was no intention to take this, to litigate this in court. Then we're done. We're done, and we don't have to look at the issue of damages and interest. We don't have to look at damages and interest. We don't have to look at commercial reasonability, the other looming question of fact that could potentially require a hearing, we're just done. Because the provision unambiguously does not require the actions that were demanded. Is the representation that there was a roughly approximately $4 million difference in what you anticipated should be paid in taxes and what actually was paid in taxes? Yeah, I don't think there's any dispute about the numbers here. Smarter accountants than I figured that out, and the parties agreed on that below. And I guess you've talked a lot about why it would be commercially reasonable not to contest this because you want to have a good relationship with the gaming board. However, I think some of it boils down to whether or not as you're negotiating it, as you're going to them, and also then working with the seller, if you thought they were right and you thought you didn't have a reasonable chance of prevailing. And to me, it seems that everybody seems to agree that it was not ambiguity. There was no ambiguity in the statute. Of course, the gaming board would say, no, no, we're getting it all. But when you read the license holder, I know you said we had to take the gross revenues for the year. Well, only per license holder. So, I mean, you know, you pay, you sell it in June, you take those gross receipts through June. Are you saying now that you really felt that it probably was reasonable to think that they could prevail? I mean, you know, or you just, it wasn't reasonable to poke them? We respected the view of the board staff, which was the graduated tax receipt. When it said, you know, you look at the adjusted gross receipts, it doesn't specify of whom. And the board said, that's why we're applying it against, effectively against the casino or against the license. And we respected that and we thought, okay, well, you know, there's an ambiguity there. Now, when you look at commercial reasonableness, one of the things that we said, and what you talked about is, you know, we don't want to poke our regulator, right? And that's a reasonable business decision. And the seller recognized that that was a reasonable business decision, because that's why they brought the first lawsuit in their name. They said, we understand that you don't want to poke your regulator. We're going to bring the lawsuit for you. They recognized the reasonableness of our position there. And I would suggest, we had our own money on the line here. We also had approximately $1.9 million on the line. We made a decision that it was, we were not likely going to succeed in front of the board, and that it didn't make any sense to continue to spend resources on this. And we didn't want to poke, you know, continue to poke the regulator, who has, you know, a person on staff on the floor of the casino every day of the week. And you have to look at all of those factors to determine commercial reasonableness. You can't, as the trial court said, just say, it's per se commercially reasonable to try to minimize your tax liability. Of course, and therefore, what the purchaser did here was not reasonable. I don't think that you can reduce this quintessential question of reasonableness, this quintessential question of fact, to that kind of analysis. When Mr. Elias was discussing the extrinsic evidence, I think I read somewhere in the briefs where the concern was that the purchaser was going to get a windfall if the tax was reset. Did you get a windfall? No. You elected not to try. We walked away from $1.9 million as well. And all they wanted with this language was to kind of level the playing field, that if you got a break, they wanted to share in that break. They wanted to split it. And that was what was agreed to if the board made a determination. But nowhere does it say, you know, that you have to challenge anything, and nowhere does it say you have to litigate. Now, I'd like to briefly address the pre-judgment interest, because I think this is my only opportunity to do that. Mr. Elias said perhaps it was a problem of communication on his part with the trial court as to why the trial court didn't address the specific issue. And I would especially agree with Mr. Elias on that point, that the concept of pre-judgment interest wasn't even raised until his reply brief on the second summary judgment motion. The statute that they are now relying on in appeal didn't even come up until their opposition to our motion to file a SOAR reply on the second summary judgment motion. There's a reason why the trial court didn't address it, and it's because the seller waived the issue. And I don't have to remind you all that, of course, an appellate court's job is to review trial court decisions. There was no decision on the application of the mandatory tax refund statute here. There's no decision for you to review, and that's because it was not appropriately raised with the trial court. Had it been raised, there would have been all sorts of issues that would have required litigation, including what is the exact interest rate that should apply. Not only when does the interest rate start to accrue, but when does it stop accruing? You would have to guess how long the refund process would have taken in order to know what period of time to apply the interest rate to. We have nothing in the record on that issue. You would have to make a decision as to Section 2.3G, whether that even authorized the splitting of interest, which was not addressed in 2.3G. 2.3G. So there are all sorts of issues that would have had to have been addressed. None of them were because it was not properly raised. Any further questions? I don't believe so. Okay. Thank you very much. First, with regard to mandatory tax refund interest, we pled at least 60 times in the trial court that once we got the taxes plus interest, plus interest, plus interest, plus interest. You could look at the trial record. Every single claim for damages we made was taxes plus interest. Late in the briefing, I calculated it for the judge. But to suggest that we waived getting interest as part of our damage claim is just wrong. You can look at the pleadings. It's in there repeatedly. And in terms of speculation, the statute is not speculative. A computer can calculate it. And, in fact, here, because interest rates are so low, it's 3%. Even I could calculate that. So it was 3%. And it was for a fixed period of time. From the time we would have got the money, which is the last day of 2011, to when the trial court ruled. That's the period. So there is nothing speculative about it. We certainly didn't waive it. Did I calculate it for the court? No. I'm not sure I had to because it's computed. It's in the statute. It's in the statute that's pled. It's not really an issue. Now, with respect to the issue of whether if you ruled against us on 11.2c on commercial reason list, does the whole case go away? No, it does not. Count one of ours, that was count two, it was breaching 11.2c and damages. And the damage calculation, the damage had a lot to do with whether we would have won the gaming tax issue before the board and the courts. Well, we also asked for declaratory judgment on the gaming tax issue itself, only the gaming tax, section 13a4. And the reason why we did that is because we have a pending working capital adjustment proceeding going on in front of an arbitrator that purchaser aborted, they filed a declaratory judgment action to get in court to stop the arbitrator. This has a long history to it. My client did not want to litigate. We were trying to proceed to an arbitrator to get this determined. But if we won, it would come out of purchaser's pocket because they weren't going to make the claim. So we tried to file suit. Prior case, we lost. When we lost that, we sued them in indemnification, and the indemnification claim didn't mean we were going to sue them. We were preserving our rights so that in the working capital adjustment, we could go to the arbitrator and say they owe us the money. His client chose to sue us to get this cleared up by a court. And, I mean, the proof is in the pudding. I think they sued us to get it out of the hands of the arbitrator because the arbitrator has an accounting background, and it would be much easier for an accountant to look at that statute as it was looked at here and say, hmm, it's on the licensed owner. That answers the timing issue of why it took so long to do the demand. In one sense, we wanted to do it without litigation, and if you know my clients, they don't like to litigate. In the second case, we were doing the prior case, and I'm not even sure we would be here if they hadn't filed the declaratory judgment action because my clients are not very litigious people. And just as an aside, I don't think my presentation here was looking at the extrinsic evidence to interpret 112C for the court. It's a sophisticated tax cooperation clause that had the words mean something and taken as a whole. You cannot mitigate, reduce, or eliminate taxes without asking somebody. It just can't be done. It's not going to a registrar and ask for a certificate. It necessarily implies asking somebody for something. That's the way the tax lawyers look at it. There's a myriad of taxes that are covered by that clause. It's very plain what it says, and you really don't look at one word, certificate, and say, well, certificate is not a court order, therefore they lose. Counsel is neglected to talk about the words other documents. It's not just certificate. It's certificate or other documents. One minute, counsel. Do you think the court is a government agency? Your Honor, in the asset purchase agreement, government agency is defined to include the courts. You can question whether we use awful words, but yes, that's why it was capitalized. I'd be happy to answer the questions otherwise. Thank you very much. Thank you all for your arguments here today. This matter will be taken under advisement, and a written decision will be issued to you as soon as possible. And now we will stand adjourned until afternoon.